The STATE of Ohio,

v.

SIMAITIS.

Crawford County Municipal Court.

No. 10 TRD 03754.

Decided Oct. 20, 2010.

Stanley E. Flegm, Crawford County Prosecuting Attorney and Jack Felgenhauer, Assistant Prosecuting Attorney, for plaintiff the state of Ohio.

---

SEAN E. LEUTHOLD, Judge.

{¶ 1} This matter came before the court for a bench trial on October 20, 2010. Present on behalf of the state of Ohio was Assistant Prosecutor Jack Felgenhauer, Trooper Robert Jones, and expert Richard McCreary. The defendant, Evaldas Simaitis, was present but not represented by counsel.

{¶ 2} The court finds as follows:

{¶ 3} At approximately 4:00 p.m. on September 14, 2010, Trooper Robert Jones of the State Highway Patrol observed the defendant's tractor trailer westbound on U.S. 30 at mile post 11, in Crawford County, Ohio, and made a visual estimation that defendant was traveling in excess of the posted prima facie speed limit of 55 m.p.h. This initial estimate was then verified through the use of Jones's Python II radar speed-detection device. Jones checked defendant's speed at 65 m.p.h.

{¶ 4} Jones testified that he had received six months of training at the Ohio State Highway Patrol Academy. This training included one week of training on speed-detection devices and visual estimation. Jones testified that he received training on how to operate and verify the proper working condition of the Python II Radar. Jones testified that in addition to the one-week class, he received 60 days of field training with a senior officer to ensure that he was capable of using the radar properly. Jones testified that he received certification for the operation of the Python II Radar and that his certification is up to date.

{¶ 5} Jones testified that at the beginning of his shift, he made sure that the Python II Radar in his patrol car was working properly. He testified that first he powered on the unit and allowed the unit to perform its internal checks, all of which were operating properly. He then placed the unit into stationary mode and took out the 80–m.p.h and 35–m.p.h. tuning forks. First, he struck the 35–m.p.h. tuning fork on a nonmetallic object and held it in front of the antenna, which resulted in a reading of 35 m.p.h in the target window. Second, he struck the 80–m.p.h. tuning fork on a nonmetallic object and held it in front of the antenna, which resulted in a 80–m.p.h reading in the target window. Next, he placed the unit into moving mode and struck both tuning forks on a nonmetallic object. As a result, he received a patrol-car speed reading of 35 m.p.h and a target speed reading of 45 m.p.h. Both tests that Jones performed demonstrated

that the unit was in proper working condition. After performing all the checks, Jones testified that he turned the unit off and it was ready for service.

{¶ 6} Jones testified that the tractor trailer that defendant was operating was a commercial unit and weighed well in excess of 8,000 pounds. In fact, Jones testified that he had experience with vehicles of this nature and that when empty, the vehicle weighed in excess of 8,000 pounds.

{¶ 7} The court heard the testimony of Richard McCreary of Ohio Calibration Laboratories, who was duly qualified as an expert witness in the operation of the K–55, the Python, the Python II, and the Python III radar speed detectors.

{¶ 8} McCreary testified that the K–55, Python I, Python II, and Python III operated on the scientific Doppler shift principle and that the only difference between the Python I, II, and III was the digital signal processor. McCreary testified that the manufacturer of the units manufactured them to become obsolete after a period of time, similar to the home-computer industry. He testified that the digital signal processors are improved and a new and improved unit is placed into the market.

{¶ 9} McCreary testified that in addition to the visual reading on the radar unit, the unit emits an audio tone. He testified that the tone frequency is directly proportional to the velocity of the target vehicle. The higher the speed of the target vehicle, the higher the tone. He further testified that the Python radars process only the strongest reflected signal, which is normally the closest vehicle. McCreary testified that the audio tone will enable the officer to verify that the proper vehicle was checked, because as the checked vehicle passes the patrol car, the tone will go down and eventually disappear.

{¶ 10} McCreary testified that inclement weather can affect the range of the radar unit.

{¶ 11} McCreary further testified that in order for an officer to operate the radar unit, the officer would need to be trained on how to turn it on, how to allow the unit to perform self-test, how to fix errors that appear during the internal checks, how to check accuracy with tuning forks, and how to operate the unit.

{¶ 12} This trial was an opportunity for the court to hear expert testimony regarding the scientific principles that support the use of the K–55, the Python, the Python II, and the Python III as radar devices to measure speed.

{¶ 13} Based upon the testimony and evidence presented, the court makes the following findings of fact regarding the use of the radar speed detectors.

{¶ 14} The radar speed detector is reliable and accurate as a scientific measure of the speed of a moving object and can be used by law-enforcement personnel to

measure vehicle speed, provided that the device is used in accordance with certain procedures delineated by the manufacturer.

{¶ 15} The admissibility of readings from stationary radar devices was considered by the Supreme Court of Ohio in *E. Cleveland v. Ferell* (1958), 168 Ohio St. 298, 7 O.O.2d 6, 154 N.E.2d 630. In that case, the court acknowledged that the principles of the Doppler effect, which underlie the operation of stationary radar devices, had been long established. Additionally, the Supreme Court of Ohio concluded that "readings of a radar speed meter may be accepted into evidence, just as we accept photographs, X rays, electroencephalographs, speedometer readings, and the like, without the necessity of offering expert testimony as to the scientific principles underlying them." Id. at 303.

{¶ 16} Specifically, the court finds that the following procedures must be employed in order for the radar speed device to accurately measure a vehicle's speed:

(a) the radar must be in proper working order;

(b) the radar must be properly checked for accuracy prior to use. The check should include a self-test done by the instrument internally; an accuracy check with tuning forks; and a calibration check at the beginning of the officer's working shift and again at the conclusion of the officer's shift; and

(c) the officer must be trained in the operation of the radar device.

{¶ 17} As a matter of fact, the court finds that if all the above conditions and procedures are applied, the K–55, the Python, the Python II, and the Python III radar speed detectors are accurate and scientifically reliable measurers of speed with a margin of error within minus two to plus two miles per hour in the moving mode and one to plus one miles per hour in the stationary mode of the actual speed of the object.

{¶ 18} To convict a person for speeding using a moving radar device, the state must prove and the record must contain (1) expert testimony of construction of the device and its method of operation in determining the speed of the approaching vehicle, (2) evidence that the device is in good condition for accurate work, and (3) evidence that the officer using the device is qualified for its use by training and experience. See *State v. Wilcox* (1974), 40 Ohio App.2d 380, 386, 69 O.O.2d 333, 319 N.E.2d 615.

{¶ 19} Based upon the testimony presented and the exhibits admitted at trial, the court finds the defendant guilty of the charge of speeding, 65 m.p.h in a 55–m.p.h. zone, and sentences him to a zero dollar fine and court costs.

So ordered.